**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARTOR KIKI BROWN** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 16-4706** |
| | : | |
| **CO SAVADOGO, ET AL.** | : | |

**MCHUGH, J.**                                                                 **June 30, 2023**

## <u>MEMORANDUM</u>

This is a civil rights action brought by Gartor Kiki Brown, a pro se litigant well known to this Court, against various corrections officials and medical staff members who worked at the prison where she was incarcerated during the events at issue.[1]   Brown alleges that several corrections officers assaulted her both physically and sexually, and that medical staff refused to treat her resulting injuries.  She seeks relief under 42 U.S.C. § 1983 on a variety of theories.  Defendants now move for summary judgment, contending that Brown failed to administratively exhaust her claims as required by the Prison Litigation Reform Act ("PLRA"), and that she lacks evidentiary support for her claims.  Because I am persuaded that Brown did not administratively exhaust her claims, I will grant summary judgment as to all of them.

---

[1] At the time of the events at issue, Brown was classified as a male pretrial detainee, and several of Brown's claims turn on the propriety of a female guard searching a male detainee.  Brown is transgender and uses she/her pronouns throughout her recent filings in this case.  *See* Pl.'s Resp. at 10, ECF 70.

## I.     Relevant Background

### A.  Brown's testimony

At the time of the events in question, Brown was a pretrial detainee at the George W. Hill Correctional Facility ("George W. Hill").  Pl.'s Decl. ¶ 3, ECF 70 at 3.[2]  On June 26, 2016, Brown was allegedly awakened  by Defendants Correctional Officer Savadogo and Sergeant Gallagher questioning her about a sheet that was placed over the light in her cell.  *Id*. at ¶¶ 5-6.  When Brown inquired why Savadogo and Gallagher were in her cell, Savadogo purportedly told Brown to "shut the 'F' up," pointed his finger in her face, and ripped down the sheet.  *Id*. at ¶ 6.  When Brown requested Savadogo to stop yelling and remove his finger from her face, he allegedly hit her across the face. *Id*.  Brown testifies that Savadogo and Gallagher then assaulted her and that Gallagher ordered that a video camera begin capturing the events taking place only after this first instance of assault.  *Id.*  Brown further alleges that she then became aware of three women, one of whom was operating a camera.  *Id.*

One of the women, Sergeant Kroll, allegedly grabbed Brown, and Gallagher directed Kroll to take Brown to the "201 cell."  *Id.*  Kroll and Savadogo then took Brown to this cell using force, including by putting Brown in a "half nelson" hold.  *Id.*  Brown was not permitted to take any of her belongings with her.  *Id.*

In the 201 cell, Brown was allegedly slammed onto a metal bed frame on her stomach, and Savadogo forcefully placed his knee on Brown's back.  *Id*. at ¶ 8.  Brown testifies that she was then dragged down the stairs, resulting in articles of her clothing flying off.  *Id.*

---

[2] She is currently in the custody of the Department of Homeland Security, awaiting removal from the United States because of the criminal offenses she committed here.

Brown next alleges that she arrived in the medical department, where she was injured and in pain but was not treated. *Id*. at ¶ 9. She alleges that Savadogo, Gallagher, and Kroll appeared to be making the medical decisions regarding her care, rather than any medical officials. *Id.*

Brown alleges that she was then dragged to the shower, where she remained handcuffed with her hands behind her back and in shackles. *Id*. at ¶ 10. Savadogo then began to assault Brown unprovoked, including by pulling her hair, hitting her, physically grabbing her, and twisting and bending Brown's arm, neck, legs, and fingers. *Id.* Gallagher directed Kroll to cut off Brown's clothing, and Brown was then strip searched. *Id.* Brown testifies that the search included Kroll painfully grabbing Brown's genitalia. *Id.* Throughout this search, an unknown woman allegedly recorded the incident. *Id.*

Brown testifies that during this search, Savadogo inserted his index finger into Brown's anus, making a hook to cause bleeding and intense pain. *Id*. at ¶ 11. Brown alleges that Savadogo yelled "you ain't a virgin no more!" after doing so. *Id.* Brown was then dragged out of the shower in a manner that caused further pain and injury. *Id.*

Defendants then left Brown in a cell without basic necessities, including sheets, a blanket, toilet paper, and a toothbrush. *Id.* Brown alleges that she was deprived medical treatment at this time, despite ongoing pain and injuries, and that Gallagher ordered an incarcerated worker to deprive Brown of food for days. *Id.* Brown received a disciplinary report for fighting and assault on staff, which she alleges was not grounded in fact. *Id*. at ¶ 12.

Brown testifies that she received some of her belongings back prior to a court date on June 29, 2016, but that these belongings smelled of urine. *Id.* She explained the causes of her injuries to the presiding judge at this court date, who appeared disturbed by her story and said that he would

consider granting a motion to transfer and that his chambers would call the George W. Hill medical department about Brown's injuries.  *Id.*

Brown alleges that she was thereafter called into the medical department, where Defendant Philips indicated that he had been contacted by an outside source—implied to be the someone from the judge's chambers—who was concerned about Brown's medical treatment.  *Id.* at ¶ 13. Despite Brown recounting her injuries, Philips allegedly said that they would only take x-rays rather than provide direct treatment, because he had concluded that nothing was wrong with Brown.  *Id.* Brown testifies that she never received medical treatment nor the x-ray results.  *Id.*

Defendants dispute Brown's version of events.  Defendants argue that an incident report shows on June 26, 2016, Brown refused to uncover her window and light and resisted attempts to have her do so.  ECF 65-1 at 2.  Defendants state that as a result of this dispute, Defendant Gallagher restrained Brown by holding her arms and legs but was not required to use any other force; that Defendant Kroll was not present during these events; and that no strip search occurred. *Id.*  Defendants further state that their exhibits show that medical staff did have to cut Brown's clothing, but only because Brown resisted when they were placing her in a different uniform.  *Id.* at 2-3.  Defendants also submit medical records indicating that Brown was immediately seen by the medical department and that there was a follow up visit in which an x-ray was ordered.  Defs.' Ex. B at 40, 50-72, ECF 65-3.

### B.  Procedural posture of the case

Brown thereafter filed suit in this court, advancing a series of constitutional claims against individuals at the facility.  With discovery closed, Defendants have moved for summary judgment, relying in part on the doctrine of exhaustion.  Because there is a factual dispute as to whether Brown had administratively exhausted her claims, I entered an Order providing notice that I would

consider the preliminary issue of exhaustion in my role as fact-finder and directing the parties to submit any supplemental briefing and additional materials on the issue by March 8, 2023.[3]  ECF 71.  At Plaintiff's request, this deadline was extended several times, ultimately until June 5.  ECF 76.  Defendants have filed a reply brief supported by an affidavit of Emmanual Asante, the Central Records Supervisor at George W. Hill Correctional Facility.  ECF 74.[4]

## II.    Standard of Review

This motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as described by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Because "exhaustion is a 'threshold issue that *courts* must address to determine whether litigation is being conducted in the right forum at the right time,'" "judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury."  *Small v. Camden Cnty.*, 728 F.3d 265, 270-71 (3d Cir. 2013) (emphasis in original) (quoting *Dillon v. Rogers*, 596 F.3d 260, 272 (5th Cir. 2010)).  Failure to exhaust is an affirmative defense that Defendants must plead and prove for each contested claim.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Small*, 728 F.3d at 268.

## III.    Discussion

The PLRA requires plaintiffs to exhaust internal prison grievance procedures before filing suit in court.  42 U.S.C. § 1997e(a); *Small*, 728 F.3d at 268.  In enacting the PRLA,

> Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.  In some instances,

---

[3] Before deciding factual disputes regarding exhaustion, a district court must notify the parties that it will consider exhaustion in its role as a fact-finder and provide parties with an opportunity to respond.  *Paladino v. Newsome*, 885 F.3d 203, 211 (3d Cir. 2018).  A full-scale evidentiary hearing is not required for every factual dispute, but "a district court must at least provide the parties with an opportunity to submit materials relevant to exhaustion that are not already before it."  *Id.*

[4] Brown filed a sur-response, belatedly docketed on June 26, 2023, ECF 79, and then docketed again when submitted for a second time.  ECF 80.   The arguments contain in Brown's response do not alter my analysis.

> corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. In other instances, the internal review might "filter out some frivolous claims." And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

*Porter v. Nussle,* 534 U.S. 516, 525 (2002) (internal citations omitted). In determining whether a plaintiff has administratively exhausted her claims, courts evaluate the plaintiff's "compliance with the prison's administrative regulations governing inmate grievances, and the waiver, if any, of such regulations by prison officials." *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004). The Supreme Court has explained that "[c]ompliance with prison grievance procedures" is required to "properly exhaust." *Jones*, 549 U.S. at 218.

Regulations promulgated pursuant to the Prison Rape Litigation Act ("PREA") place some limits on the procedural requirements that prisons can impose for grievances regarding sexual abuse. *See* 28 CFR § 115.52.[5] That said, the "federal courts that have considered the issue have concluded that the PREA does not excuse an inmate's failure to exhaust his administrative remedies with respect to a claim of sexual misconduct." *Omaro v. Annucci*, 68 F. Supp. 3d 359, 364 (W.D.N.Y. 2014) (citing *Porter v. Howard*, 531 F. App'x 792, 793 (9th Cir. 2013); *Myers v. Grubb*, No. CV 12–29–H–DLC, 2013 WL 352194, at *1 (D. Mont. Jan. 29, 2013); *Lamb v. Franke*, No. 2:12–CV–00367–MO, 2013 WL 638836, at *2 (D. Or. Feb. 14, 2013)).

The George W. Hill Correctional Facility Inmate Handbook sets forth the facility's internal prison grievance process for incarcerated individuals who have complaints that cannot be resolved through other means. Def. Ex. E (the Inmate Handbook) at 45-46, ECF 65-6; Def. Ex. D (Gartor Brown's signed acknowledgment form for receiving the Inmate Handbook), ECF 65-5. The Handbook establishes a three-step grievance process:

---

[5] For instance, Section 115.52 prohibits agencies from requiring incarcerated people "to use any informal grievance process, or to otherwise attempt to resolve with staff, an alleged incident of sexual abuse."

1. Grievants must first exhaust existing informal channels before submitting a formal grievance.

2. Grievants must then complete a grievance form, which the George W. Hill Correctional Facility refers to as a Step 1 grievance form.  George W. Hill requires grievance forms to include a description of the problem and the action requested.  Grievants retain a pink carbon copy of the completed form and place the other two copies of the form in a grievance box.

3. Grievants will then receive a response to the grievance and have seven days to write an appeal of the original grievance to the warden, which the George W. Hill Correctional Facility refers to as a Step 2 grievance form.

Def. Ex. E at 45-46.  The Handbook advises individuals that they must first seek assistance from their Unit Supervisor and gives notice in all capital letters: "EXISTING INFORMAL CHANNELS MUST BE EXHAUSTRED BEFORE SUBMITTING A FORMAL GRIEVANCE. WHEN FILING YOUR GRIEVANCE, STATE THE STEPS YOU HAVE TAKEN TO RESOLVE YOUR PROBLEM."  *Id.*

In a separate section on "Sexual Abuse/Assault" under PREA, the Handbook explains how individuals should report incidents of sexual assault.  The Handbook explains that "[i]f you become a victim of a sexual assault, you should report it immediately to a staff member who will offer you immediate protection from the assailant and will refer you to the Medical Department. . . . You can tell your Counselor, Chaplain, Psychologist, Nurse, Block Officer or any other staff member you trust."  The Handbook provides other means "to confidentially report the assault if you are not comfortable with staff," including writing directly to the Warden or calling the hotline for the Delaware County Women Against Rape.

7

In their motion for summary judgment, Defendants argued that Brown filed two Step 1 grievances regarding the events at issue, but that she never filed a Step 2 grievance and so never administratively exhausted her claims.  Defendants further argued that because the claims in Brown's Second Amended Complaint concern events that allegedly took place *after* the initiation of the lawsuit, Brown could not have exhausted those claims before filing suit.  In response, Brown argued that she had exhausted the grievance procedure to the extent that she feasibly could have, and that because her claims were PREA-related, she had exhausted them by reporting them to the Warden and by calling the PREA hotline in July of 2016.  She additionally attached what appeared to be Step 2 grievances to her response.

I will begin my analysis with the grievance forms that Brown attached to her briefing. Several of Brown's attached grievances are dated after the initiation of the present action.  The Third Circuit has made clear that administrative exhaustion under the PLRA must be completed *before* the filing of suit.  *See Ahmed v. Dragovich*, 297 F.3d 201, 209 (3d Cir. 2002) ("Whatever the parameters of 'substantial compliance' referred to there, it does not encompass . . .  the filing of a suit before administrative exhaustion, however late, has been completed."); *see also Johnson v. Jones*, 340 F.3d 624, 627-28 (8th Cir. 2003) (compiling cases from various circuits that all held that the PLRA requires exhaustion prior to the commencement of an action).  Because Brown filed her initial complaint on September 27, 2016, the grievance forms contained in the following exhibits do not bear on the exhaustion issue: Exhibits 63, 64, and 65.  ECF 70 at 82-84.

Of the remaining grievance forms submitted by Brown, only one of them appears to be a Step 2 grievance that could demonstrate exhaustion under the facility's grievance procedure: Exhibit 55.  *Id.* at 73.  But as the defense argues, this form, along with several Step 1 grievances,

bear strong signs of either never being submitted or being manufactured after the fact and therefore fail as proof of Brown's compliance with the prison's grievance procedures.

The defense supports its position with an affidavit from Emmanual Asante, George W. Hill's Central Records Supervisor.  This affidavit casts doubt on the legitimacy of the specific grievance forms that Brown attached to her response brief.  Asante explains that grievance forms should contain the name of a grievance coordinator who received the grievance and the date on which it was received, along with the grievance coordinator's stamp, all of which the Step 2 grievance contained in Exhibit 55 lacks.  Asante Aff. ¶ 14; Pl.'s Ex. 55, ECF 70 at 73.  The grievance in Exhibit 55 is written in dark ink, but because incarcerated individuals only retain a pink carbon copy of their grievances, the writing on their copies is typically very faded.  Asante Aff. ¶ 16; Pl.'s Ex. 55, ECF 70 at 73.  The unfaded nature of the writing on Exhibit 55 therefore casts doubt on its legitimacy.  Asante Aff. ¶ 16; Pl.'s Ex. 55, ECF 70 at 73.

Mr. Asante's affidavit also establishes the general reliability of George W. Hill's recordkeeping system.  He attests that "[i]n and around 2016, there was a process in place where grievances were logged into a central computer system, and also paper copies were kept in the inmate's files.  The grievances were stamped with a date of receipt, and given a unique number which was recorded in the computer system."  Asante Aff. ¶ 3, ECF 74-1.  Asante further represents that

> [i]n [his] years of experience working at the George W. Hill Correctional Facility as Grievance Coordinator and then in records, [he has] found the grievance system and record keeping to be very reliable since there is both an electronic record and a paper record.  Therefore, it would be very unlikely to lose or have no record of a grievance that had been properly submitted to the grievance coordinator.

*Id*. at ¶ 9.  This testimony lends weight to the defense's position that, outside of the two Step 1 grievances contained in Exhibits 56 and 57, none of the grievances relevant to this action were submitted to or filed with George W. Hill.  Def.'s Reply at 2, ECF 74.

Mr. Asante's testimony provides evidence of the reliability of George W. Hill's recordkeeping system, in compliance with the requirements of *Paladino*.  There, the Third Circuit overturned a district court's finding of administrative exhaustion because of a lack of evidence of such reliability in the face of a discrepancy between the prison's records showing no relevant grievance and the plaintiff's deposition testimony that he had submitted at least six.  *Paladino*, 885 F.3d at 208-211.  In so ruling, the Third Circuit emphasized that the prison's argument depended on the reliability of its recordkeeping system but that "the record [was] bereft of evidence that the Prison's recordkeeping system [was] reliable."  *Id*. at 211.  The Third Circuit noted that the prison "employ[ed] a paper-based record system, as opposed to an electronic system, for forms filed by" individuals, *id.* at 211 n.47, raising a question as to the systesm's completeness and dependability.  As part of its analysis, the Court of Appeals cited *Dawson v. Cook*, 238 F. Supp. 3d 712, 719 (E.D. Pa. 2017), with approval, where, the court concluded that "despite deposition testimony to the contrary, there was 'no basis . . . to conclude that Plaintiff submitted a grievance that was not recorded' because there was 'no electronic record of the grievance' in the Philadelphia Prison System's electronic system."  *Paladino*, 885 F.3d at 211 n.47 (quoting *Dawson*, 238 F. Supp. 3d at 719).

In this case, Mr. Asante's affidavit attesting to the reliability of the prison's system, together with his cogent explanation of anomalies in the exhibits submitted by Brown, persuade me that the Step 2 grievance form contained in Exhibit 55 is not authentic and may be discounted.

I am also compelled to observe that Brown has proven herself untrustworthy in previous cases before this Court. She has attempted to survive summary judgment by submitting sworn testimony that was proven false by record evidence, including in one case by a videotaped recording that plainly contradicted Brown's allegations, *Brown v. Upper Darby Police Dep't*, No. CV 16-2255, 2020 WL 733108, at *4-*5 (E.D. Pa. Feb. 13, 2020), *aff'd*, No. 20-1452, 2021 WL 2948833 (3d Cir. July 14, 2021), and two others where voluminous, contemporaneous medical records refuted her claim of serious physical injury. *Brown v. Phillips*, No. CV 16-3887, 2020 WL 6158230, at *3-*4 (E.D. Pa. Oct. 21, 2020), *aff'd sub nom. Brown v. Moore*, No. 20-3600, 2022 WL 1772992 (3d Cir. June 1, 2022); *Brown v. Phillips*, No. CV 16-2566, 2021 WL 2903116, at *10-*11 (E.D. Pa. July 9, 2021). In those cases, I found that Brown "demonstrated willingness 'to do whatever it takes' to keep a case alive," including falsifying testimony, and I followed the Third Circuit's admonition that district courts should not place weight upon transparent attempts to defeat summary judgment. *Brown*, No. CV 16-3887, 2020 WL 6158230, at *4 (citing *Martin v. Merrell Dow Pharm., Inc.,* 851 F.2d 703, 705-06 (3rd Cir. 1988)). That prior experience lends support to the defense's conclusion that the Step 2 grievance form contained in Exhibit 55 is not genuine.

Moving from the analysis of the specific grievance forms that Brown submitted, Brown also argues that, because her claims concern alleged sexual abuse, they are not subject to the three-step grievance process. Rather, such claims need only be informally grieved by reporting them to a staff member, reporting them to the Warden, or by calling the hotline for the Delaware County Women Against Rape. Brown testifies that she verbally reported her claims to the Warden and called the hotline.

However, the grievance forms that all parties agree Brown *did* submit demonstrate that, although Brown complained of a cavity search in her initial grievance, she only characterized it in terms of sexual abuse later on.  In Brown's initial Step 1 grievance, submitted the same month of the alleged incident, Brown described a strip and cavity search.  Pl.'s Ex. 56, ECF 70 at 74.  It was not until the form submitted the following month that Brown for the first time characterized the incident as sexual assault.  Pl.'s Ex. 57, ECF 70 at 76.  In this regard, Brown's case is comparable to *Smith v. Secretary of Pennsylvania Department of Corrections*, No. CV 17-93, 2018 WL 279363, at *3 (W.D. Pa. Jan. 3, 2018), *aff'd,* 747 F. App'x 101 (3d Cir. 2018).  In *Smith*, the plaintiff filed an initial grievance pertaining to strip and cavity searches but did not characterize those searches as sexual abuse or harassment until a later point in time.  *Id.*  The court held that because searches "conducted in accordance with approved institutional security policy . . . do not implicate either of the alternative grievance or complaint processes," "Plaintiff's belated-recharacterization of the searches  . . . does not alter the procedural path that he was required to follow to meet the exhaustion mandate of the PLRA."  *Id.*  The same logic applies here. Furthermore, the very fact that Brown began with initiating the three-step grievance process rather than the PREA reporting process demonstrates that her later attempt to rely on PREA procedures was merely an attempt to recategorize her complaint to avoid the PLRA's exhaustion requirements.

Finally, Brown argues that because the grievance process was functionally unavailable to her, her claims should not be dismissed on exhaustion grounds.  First, she claims that the responses to the grievances she filed only indicated that the forms were received and would be investigated, rather than denying her grievances to allow her to appeal.  But the forms that Brown submitted show otherwise.  It is true that the "disposition" section in the response to the Step 1 grievance submitted on June 27 states only that the "grievance has been received and reviewed and will be

looked into by the appropriate staff."  Pl.'s Ex. 56.  But the same form instructs Brown what to do "[i]f [she] believe[s] the issue was not resolved and desire[s] to appeal to step two," so Brown should have been on notice of the need to file a Step 2 grievance before receiving any further response.  *Id*.  Furthermore, in response to the Step 1 grievance submitted on July 6, the "disposition" states that the grievance was received and reviewed and found to be unsubstantiated.  Pl.'s Ex. 57.  As a result, I do not find credible Brown's arguments that she was unable to submit a Step 2 grievance.

Brown further argues that she could not have exhausted the grievance process because George W. Hill itself violated the process by not responding to her initial grievances within seven days.  She draws on *Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 153 (3d Cir. 2016), in which the Third Circuit held that a prison's "failure to respond to [a] grievance—even after its own deadline had passed and multiple follow-up requests were made—rendered the prison's administrative remedies 'unavailable' … under the PLRA."  But *Robinson* is not analogous to this case.  There, the prison did not respond to the grievance for over four months, *id.* at 155, despite the prison's grievance policy specifying that the Grievance Officer "*shall* provide a written response . . . within 10 working days of receipt of the grievance."  *Id*. at 151 (emphasis added).  In contrast, George W. Hill's grievance policy merely provides that "[a] normal response to a grievance will be within 7 days of the grievance excluding Holidays and Weekends," and Brown alleges that the response she received was dated thirteen days from her filing.  Because George W. Hill did not ignore a mandatory time requirement, nor wait an unreasonable amount of time, the grievance process cannot be characterized as "unavailable" to Brown under *Robinson*.

**IV.      Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment will be granted in its entirety.

/s/ Gerald Austin McHugh
United States District Judge

14